UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                 :

SANDAWANA HOLDINGS LTD.,           :
                                                 :  1:11-CV-02712 (AKH)

                 Plaintiff,      :

                                                  :  **ORAL ARGUMENT REQUESTED**

            - against -        :
                                                 :

HENRY DUNAY,                  :
                                                 :

                 Defendant.    :
                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR VACATUR OF THE
COURT'S AUGUST 16, 2011 AND NOVEMBER 21, 2011 ORDERS
AND FOR DISMISSAL OF THIS ACTION,
OR, IN THE ALTERNATIVE, FOR A STAY PENDING APPEAL**

Charles E. Colman, Esq. (CC-1133)
Charles Colman Law, PLLC
1776 Broadway, 21st Floor
New York, NY 10019-0064
Telephone: (917) 515-5875
Fax: (917) 534-6294
cc@charlescolmanlaw.com

*Attorney for Defendant Henry Dunay*

## TABLE OF CONTENTS

A. INTRODUCTION…………………………………………………………………5

B. FACTUAL AND PROCEDURAL BACKGROUND……………………………….6

C. ARGUMENT…………………………………………………………………..9

    1. **The Court Should Vacate Both Its August 16th and its November 21st Orders Under Rule 60(b)(4) As Void for Lack of Subject Matter Jurisdiction, and Dismiss This Action**…………………………………………………………..9

        a. **The Court Has Lacked Subject Matter Jurisdiction from the Outset of This Litigation, Because This Action Has Always Been a Non-Diverse Breach of Contract Suit in Trademark's Clothing**……..10

        b. **Even if the Court Was Empowered to Exercise Subject Matter Jurisdiction at the Outset of This Case, It Lacked the Requisite Jurisdiction to Issue the November 21st Order**………………………..12

    2. **The Court Should Vacate Its November 21st Order Under Rule 60 Because It Resulted From "Mistake"; Because of Sandawana's Misrepresentations and Misconduct; and in the Interest of Justice**……….16

        a. **The Court Should Vacate Its November 21st Order Under Rule 60(a) Due to Legal and Factual "Mistake[s] Arising From Oversight" and under Rule 60(b)(1) Due to "Mistake"**………………………….16

        b. **The Court Should Vacate Its November 21st Order Under Rule 60(b)(3) Due to Plaintiff's Misrepresentations and Misconduct, and/or under Rule 60(b)(6) for "Any Other Reason That Justifies Relief," Including Sandawana's Demonstrated Intention to Abuse the Order If the Court Allows It to Stand**……………………………………………..22

    3. **If the Court Finds that It Possessed the Requisite Jurisdiction at All Times and Declines to Vacate the August 16th and November 21st Orders, It Should Nevertheless Stay the Effect of Those Orders Pending Appeal**..24

D. **CONCLUSION**……………………………………………………………..25

## TABLE OF AUTHORITIES

### Cases

*Achtman v. Kirby, McInerney & Squire, LLP*,
    464 F.3d 328 (2d Cir. 2006)……………………………………………………12, 13

*American Trucking Ass'ns, Inc. v. Frisco*,
    358 U.S. 133, 145 (1958)………………………………………………………17

*Catskill Dev., L.L.C. v. Park Place Entm't Corp.*,
    286 F. Supp. 2d 309 (S.D.N.Y. 2003) ……………………………………………...23

*Dennis Michels Productions, Inc. v. Kaplan*,
    No. 89 Civ. 3726, 1989 U.S. Dist. LEXIS 11631 (S.D.N.Y. Oct. 4, 1989)…………17

*Empire HealthChoice Assur., Inc. v. McVeigh*,
    547 U.S. 677 (2006) ……………………………………………………………15

*Hadges v. Yonkers Racing Corp.*,
    48 F.3d 1320 (2d Cir. 1995) …………………………………………………………23

*HBE Leasing Corp. v. Frank*,
    48 F.3d 623 (2d Cir. 1995) …………………………………………………………..24

*In re Am. Express Fin. Advisors Securities Litigation*,
    No. 10-3399, 2011 U.S. App. LEXIS 22209 (2d Cir. Nov. 3, 2011)………………..13

*J.A. Apparel Cop. v. Abboud*,
    568 F.3d 390 (2d Cir. 2009) ……………………………………………17, 19, 20

*Kokkonen v. Guardian Life Ins. Co.*,
    511 U.S. 375 (1994)……………………………………………………………...10, 13

*Rosenberg v. Inner City Broad. Corp.*,
    99 Civ. 9579, 2001 U.S. Dist. LEXIS 13192 (S.D.N.Y. Aug. 30, 2001)……………12

*Schildhaus v. Moe*,
    335 F.2d 529 (2d Cir. 1964) …………………………………………………………16

*Stancato v. Versace*,
    No. 94 Civ. 4192, 1995 U.S. Dist. LEXIS 10324, (S.D.N.Y. Jul. 25, 1995)…...10, 11

*Tap Publs. v. Chinese Yellow Pages,*
    925 F. Supp. 212, 217 (S.D.N.Y. 1996)……………………………………………10, 11

## **Statutes and Regulations**

28 U.S.C. § 1292…………………………………………………………………………24

28 U.S.C. § 1331……………………………………………………………………7, 11

28 U.S.C. § 1338……………………………………………………………………7, 11

28 U.S.C. § 1367…………………………………………………………………………..7

37 C.F.R. § 2.72……………………………………………………………………………19

## **Federal Rules of Civil Procedure**

Fed. R. Civ. P. 12(b)(1)…………………………………………………………………12

Fed. R. Civ. P. 60(a)………………………………………………………………16, 17, 23

Fed. R. Civ. P. 60(b)(1)…………………………………………………………………16

Fed. R. Civ. P. 60(b)(3)…………………………………………………………………23

Fed. R. Civ. P. 60(b)(4)………………………………………………………………..9, 12

Fed. R. Civ. P. 60(b)(6)………………………………………………………………..23

## A. INTRODUCTION

Henry Dunay ("Henry") is a 76-year-old jewelry designer.  Declaration of Henry Dunay (hereinafter "Dunay Decl.") at ¶ 1.  He has been a jewelry designer for most of his adult life, and believes designing and selling jewelry is the only way he can realistically support himself.  *Id.* at ¶ 4.  If Sandawana Holdings Ltd. gets its way, Henry will be prevented from using his name in connection with jewelry in virtually any way – and essentially be banished from all uses of his name on the Internet, where more commerce in the luxury goods sector takes place with each passing year.  *Id.* at ¶ 19.

Concerned only with accumulating as much "online real estate" as possible, and in disregard of agreement(s) between the parties, Sandawana has misrepresented the true scope of its trademark rights and repeatedly conflated trademark and non-trademark – and even commercial and non-commercial – uses.  Unfortunately, the Court's November 21, 2001 Order (and the November 14, 2011 Transcript providing the reasoning behind that Order) contain several factual and legal errors that Sandawana can abuse, and has abused, in furtherance of its objectives.

Fortunately, this Court can "right the ship" by vacating its recent Order.  Indeed, the Court *must* vacate not only the November 21st Order, but all of its Orders in this case, as it lacked the requisite subject matter jurisdiction to issue them.  From the outset, this case has been nothing more than a non-diverse breach of contract suit "in trademark's clothing," strategically framed as a Lanham Act case.  But even if this Court declines to vacate its Orders and dismiss this case, it should nevertheless stay the effect of all relevant Orders pending Henry's appeal to the Second Circuit.

### B.    FACTUAL AND PROCEDURAL BACKGROUND

In 2009, Henry Dunay and his well-respected jewelry company, Henry Dunay

Designs, filed a voluntary petition for relief under Chapters 7 and 11 of the United States

Bankruptcy Code.  Declaration of Charles Colman (hereinafter "Colman Decl."), Exh. A

(Plaintiff's Complaint and Exhibits) at 15.  Through an March 18, 2010 "Asset Purchase

Agreement," Plaintiff Sandwana Holdings Ltd. ("Sandawana") acquired certain "assets,"

including three U.S. federal trademark registrations, but notably, *not* expressly including

a plain-text (or so-called "standard character") registration in the words "HENRY

DUNAY."  *Id.* at 28-29.  The reason for this was clear: neither Henry nor his company

had ever applied for a federal trademark registration for "HENRY DUNAY" in plain text;

the three registrations owned by the company were all, in the words of the U.S. Patent

and Trademark Office, "WORDS, LETTERS, AND/OR NUMBERS ***IN STYLIZED***

***FORM***."  *Id.* at 39, 42, 45 (emphasis added).

With that said, "SCHEDULE B" of the Asset Purchase Agreement did purport to

include among Henry's and his company's assets "[a]ll internet sites and websites,

domain names, copyrights, patents and trademarks and intellectual property rights,

including, without limitation, the trademarks [referred to above.]"  *Id.* at 30.  But

conspicuously absent from this list is Henry's ***name***, which had never been registered

as a trademark except in the form of stylized designs, most likely because only those

stylized designs had been consistently used as trademarks, for approximately forty

years.  Dunay Decl. at ¶ 15.  Thus, Henry (reasonably) never believed – and still does

not believe – that he signed away the right to use his name in all commercial respects

concerning jewelry design.  *Id.* at ¶ 6.  Had Henry been under that impression, he never would have signed the Asset Purchase Agreement with the terms presented.  *Id.* at ¶ 17.

The language in SCHEDULE B of the Asset Purchase Agreement, though "covering the field" of intellectual property rights between the parties, so to speak, eventually gave rise to a dispute as to scope.  Strategically framing this contract dispute as an action for trademark infringement, Sandawana brought suit in federal court on April 20, 2011, purporting to invoke the Court's jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367.  Colman Decl., Exh. A at 3, ¶ 10.

On August 16, 2011, the Court issued an Order embodying a settlement between the parties, which provided in part:

> Defendant Henry Dunay, HDD, HDD's affiliates, HDD's divisions, and HDD's subsidiaries, as well as HDD's respective principals, officers, agents, servants, employees and all others acting in direct and/or indirect concert or participation with them, be and hereby are permanently restrained on a worldwide basis from: using the Henry Dunay TRADEMARKS or any mark or design that incorporates and/is [*sic*] confusingly similar thereto, as a design, trade name, service mark, brand name, domain name, and/or designation of source or origin of any good or services relating to jewelry or the sale, licensing, manufacture, advertising, promotion, and/or distribution thereof.  All other provisions as further set forth in this order."

(Dkt. No. 19).  The Court stated that it would retained jurisdiction for enforcement purposes.  *Id.*  However, in neither the July 20, 2011 Order closing the case but "retain[ing] jurisdiction to resolve any disputes arising under the consent decree" nor the August 16, 2011 Order endorsing the settlement and closing the case "except for enforcement" did the Court limit the length of time it would retain such jurisdiction, specify how it would determine whether a dispute did, in fact, fall within the scope of the

settlement, or indicate how it would resolve such a dispute. (Dkt. 12, 19.)

Given Sandawana's apparently limitless desire for all Internet "real estate" in any way connected with Henry, and conversely, Henry's inability to make a living without using his name, *see* Dunay Decl. at ¶¶ 4, 5, a dispute about the settlement agreement unsurprisingly arose. That dispute centered on whether Sandawana was entitled to the henrydunay.net domain name (purchased by Henry's fiancée Frinette Simon, *not* at Henry's instruction, *after* the bankruptcy had been settled, Dunay Decl. at ¶ 13) *under the Asset Purchase Agreement and the August 2011 Settlement Agreement.* (Dkt. 28.)

A proceeding on the above-mentioned issue was held before the Court on November 14, 2011 ("November 14th proceeding"), at which the Court appears to have made certain findings of fact without an evidentiary basis in the record (*see*, *e.g.*, Colman Decl., Exh. B at Transcript page 3 (stating that Ms. Simon was "a proxy" for Mr. Dunay for purposes of the henrydunay.net domain name registration); *id.* at Transcript page 9 (stating that henrydunay.net domain name and henrydunay@hotmail.com e-mail address are "very similar")) and drawn legal conclusions – some erroneous – notably based *not on trademark law*, but on the *Asset Purchase Agreement* (*see id.* at 9 ("This is plainly an Internet website that belongs to Sandawana, or should be, because it purchased all right, title and interest in that website and domain name.")) The Court issued a Summary Order docketed on November 21, 2011 ("November 21st Order"), providing that "the Court shall find Defendant in contempt unless he assigns the henrydunay.net domain name ***and all other internet accounts bearing his name*** to Plaintiff by November 22, 2011." (Dkt. 36, emphasis added) The basis for the

essentially unlimited scope of highlighted language was not clear, as many "internet accounts" now in dispute (including, most notably, a personal, private facebook page never used for commercial purposes) had not been substantively addressed during the November 14, 2011 proceeding.  *See generally* Colman Decl., Exh. B.

Since the Court issued its Order regarding "all other internet accounts," Sandawana has grown increasingly aggressive, apparently emboldened by the broad language of the Court's Order, Henry's temporary *pro se* status, and/or the Defendant's advanced age.  *See* Dunay Decl. at ¶ 23.  In fact, Sandawana's counsel, Peter Berger, went so far as to threaten Henry, a 76-year-old man in poor health, by stating in a November 24, 2011 phone call that if Henry did not transfer his facebook and Twitter accounts to Sandawana, Berger would have him "put in jail" over the holidays.  *Id.* at ¶¶ 1, 2, 25.  Thus, out of fear, Henry shut down his facebook and Twitter accounts although he continues to believe he has a right to use them.  *Id.* at 26.  Sandawana's continuing threats are causing emotional trauma to Henry and have made him afraid to maintain any identifiable presence on the Internet, without which he will be unable to earn a living, *id.* at ¶¶ 26, 5, or even maintain a *social* presence.

This newly-retained counsel filed a Notice of Appearance on Monday, December 5, 2011, and filed these motion papers on the same day.

## C.   ARGUMENT

### 1. The Court Should Vacate Both Its August 16th and its November 21st Orders Under Rule 60(b)(4) As Void for Lack of Subject Matter Jurisdiction, and Dismiss This Action

From day one, this litigation has been nothing more than a breach of contract

dispute between non-diverse parties, requiring interpretation not of federal law, but only of the parties' Asset Purchase Agreement (and now, of the Court's Order attempting to enforce that Agreement.)  Neither the original contract dispute nor the Court's Orders attempting to resolve that dispute can supply, or have supplied, subject matter jurisdiction in this case.  **Sandawana** has the burden of proving that the Court possessed the requisite jurisdiction at all times, *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994), and for the following reasons, this is a burden it cannot sustain.

### a. The Court Has Lacked Subject Matter Jurisdiction from the Outset of This Litigation, Because This Action Has Always Been a Non-Diverse Breach of Contract Suit in Trademark's Clothing

From the outset of this litigation, Plaintiff Sandawana has attempted to frame a run-of-the-mill, non-diverse breach of contract suit as a Lanham Act action, in order to invoke the jurisdiction of the federal courts.  However, as Judge Keenan stated in *Stancato v. Versace*, No. 94 Civ. 41921995 U.S. Dist. LEXIS 10324, at *5 (S.D.N.Y. Jul. 25, 1995), "the formal allegations of [a] complaint must yield to the substance of the claim."  The court continued:

> [I]t is well settled that the federal courts do not have subject matter jurisdiction in cases where a trademark is merely the subject matter of a contract dispute. Plaintiffs foremost are attempting to enforce their contractual rights. The mere involvement of [a federally registered trademark] does not confer federal jurisdiction over what is essentially a contract dispute . . . . ***In cases where a contract establishes which party owns a particular trademark, it is the contract and not the Lanham Act that determines the rights of the parties.***

*Id.* at *7 (emphasis added).

Likewise, in *Tap Publs. v. Chinese Yellow Pages*, 925 F. Supp. 212, 217 (S.D.N.Y. 1996), a plaintiff claimed "that it ha[d] exclusive rights to use [a] mark in the

New York metropolitan region," arguing "that [a] 1986 settlement agreement gave this right to [do so.]"  Judge Koeltl observed that the plaintiff's purported Lanham Act claim "involve[d] questions of contract interpretation" only, and thus "should be determined by the principles of contract law."  *Id.*  "The Lanham Act, in contrast, establishes marketplace rules governing the conduct of parties not otherwise limited."  *Id.*

*Stancato* and *Tap* are instructive here.  Sandawana's suit against Mr. Dunay has always boiled down to this: SCHEDULE B of the parties' Asset Purchase Agreement lists among the assets to be transferred "[a]ll internet sites and websites, domain names, copyrights, patents and trademarks and intellectual property rights, including, without limitation, the trademarks [referred to above.]"  Colman Decl., Exh. A at 30.  Sandawana has argued for a broad interpretation of this provision; Mr. Dunay takes a narrower view of the correct meaning of the operative contractual language.  But this dispute about contractual interpretation, interesting though it may be, <u>presents no federal question under the Lanham Act or any other federal law</u>.

Even Sandawana's Complaint, which attempts to invoke the jurisdiction of the federal courts under 28 U.S.C. §§ 1331 and 1338, essentially admits that this is, at its root, a lawsuit about an alleged breach of contract.  In ¶ 24 of that Complaint, Sandawana alleges: "Upon information and belief, Defendant has chosen to provide his goods and services using the infringing 'HENRY DUNAY' trademark despite his knowledge that Sandawana purchased all rights, title and goodwill to the Henry Dunay Trademarks from Defendant and Dunay Designs."  Colman Decl., Exh. A, at 6.

Even the Asset Purchase Agreement through which Plaintiff made its alleged

"purchase" makes clear (albeit by implication) that *the contract* – not federal business tort law – is intended to govern the rights and remedies between the parties, stating: "Nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on Persons other than Seller and Buyer[.]"  *Id.* at 24 ("Section 9.9").  In other words, the Agreement *is* intended to confer rights and remedies on the Seller and Buyer, who happen to be the parties in this case.  "Where [as here] parties enter into an agreement governing their respective rights in a trademark, the contract itself defines their rights in the mark and determines the remedies available for an allegedly unauthorized use of the mark."  *Society for the Advancement of Educ., Inc. v. Gannett Co., Inc.*, 98 Civ. 2135 (LMM) 1999 U.S. Dist. LEXIS 700, *26 (S.D.N.Y. Jan. 21, 1999).  As such, this is not, and has never been, a case for the federal courts.

In light of the foregoing, all of the Court's Orders in this litigation should be vacated under Federal Rule of Civil Procedure 60(b)(4) and and the case should be dismissed with prejudice under Rule 12(b)(1).

### b. Even if the Court Was Empowered to Exercise Subject Matter Jurisdiction at the Outset of This Case, It Lacked the Requisite Jurisdiction to Issue the November 21st Order

As this Court has observed, "[a] settlement agreement is a contract," and "[t]he enforceability of contracts generally is a question of state law, not federal law." *Rosenberg v. Inner City Broad. Corp.*, 99 Civ. 9579, 2001 U.S. Dist. LEXIS 13192, at *7 (S.D.N.Y. Aug. 30, 2001) (Hellerstein, J.) (footnote omitted).  Even assuming *arguendo* that Sandawana did properly invoke the subject matter jurisdiction of the Court at the outset of the litigation, that jurisdiction has now been exhausted.

As the Second Circuit explained in *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 333 (2d Cir. 2006) (internal citations omitted):

> The power of the inferior federal courts is "'limited to those subjects encompassed within a statutory grant of jurisdiction.'" Although an exercise of 'judicial power [may be] desirable or expedient,' a suit may not proceed absent statutory authorization. . . . In short, jurisdiction cannot simply be "expanded by judicial decree."

Thus, in addressing whether an injunction "could establish an independent basis for subject matter jurisdiction" over the action before it, the *Achtman* court ruled that "the Injunction cannot itself furnish jurisdiction over claims that do not fall within one of the traditional statutory grants [like federal-question or diversity jurisdiction.] To hold otherwise would make mincemeat of the limited grants of jurisdiction bestowed upon us." *Id.* at 334.

Recently, the Second Circuit held that given "the context of class actions, which are complicated, expensive proceedings involving a multitude of different parties and potential parties . . . [a] district court therefore 'has the power to enforce an ongoing order against relitigation so as to protect the integrity of a complex class settlement over which it retained jurisdiction.'" *In re Am. Express Fin. Advisors Securities Litigation*, No. 10-3399, 2011 U.S. App. LEXIS 22209, at *50 (2d Cir. Nov. 3, 2011). However, this counsel has come across no Second Circuit case squarely holding that a federal district court may retain perpetual and otherwise unlimited jurisdiction over the enforcement of a routine settlement agreement between two parties, simply by endorsing it as a "consent decree." While the Supreme Court acknowledged this practice in *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 381-82 (1994), it did so only in *dicta*; in the very same

opinion, the Court provided a reminder that "[i]t is to the holdings of our cases, rather than their dicta, that we must attend[.]"  *Id.* at 379.

In the apparent absence of binding authority, there is good reason for the Court to find that federal district courts may not create their own "bubbles" of subject matter jurisdiction over the enforcement of specific settlement agreements that do not raise questions of federal law.  ***Certainty*** is one such reason: neither the Court's July 20, 2011 Order closing the case but "retain[ing] jurisdiction to resolve any disputes arising under the consent decree" nor the August 16, 2011 Order endorsing the settlement and closing the case "except for enforcement" limited the length of time it would retain such jurisdiction, specify how it would determine whether a dispute did, in fact, fall within the scope of the settlement, or indicate how it would resolve such a dispute.  (Dkt. 12, 19.)

In the absence of prescribed procedures, when a dispute over the settlement agreement did arise in this case, the Court did not employ conventional fact-finding tools that would be available in a new, full-fledged enforcement suit.  Instead, the Court made several erroneous findings of fact, essentially *sua sponte.*  For example, the Court summarily stated during the November 14, 2011 proceeding that Ms. Simon was "a proxy" for Mr. Dunay for purposes of the henrydunay.net domain name registration, Colman Decl., Exh. B at 3, but this was not factually accurate.  *See* Dunay Decl. at ¶ 13 ("I did not instruct my fiancée, Frinette Simon, to purchase the henrydunay.net domain name.")  At the very least, the question presented a disputed issue of material fact requiring a jury determination, which was unavailable due to the posture of the case.

Likewise, the Court stated during the November 14th proceeding that that

henrydunay.net domain name and the henrydunay@hotmail.com e-mail address are "very similar," such that they should be treated identically for purposes of the Court's Order.  Colman Decl., Exh. B at 9.  But in fact, there are numerous *factual* differences between a domain name and an e-mail address.  For example, a domain name can make content available to the general Internet-using public, while an e-mail address cannot.  Domain names (by virtue of their ability to direct web users to content posted on websites) are capable of performing a "marketing" function, while an e-mail address cannot practically perform such a function.  This issue likely requires expert testimony.

As with the Court's finding on the "proxy" issue, the Court's inaccurate factual findings on the domain name/e-mail address issue (the latter of particular relevance in a dispute concerning trademarks) reveal that fast-tracked enforcement proceedings are ill-suited for the adjudication of disputed factual questions.  Notably, the U.S. Supreme Court has found that there may well be a line of jurisdictional significance between certain cases "present[ing] a nearly 'pure issue of law . . . that could be settled once and for all and thereafter would govern numerous [federal] cases,'" and certain "fact-bound and situation-specific" cases that are ineligible for federal court adjudication.  *Empire HealthChoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 700-701 (2006).

Finally, allowing parties to convert a private settlement contract into an official consent decree that purports to grant a federal court jurisdiction over the enforcement of that contract runs directly counter to the well-established rule that parties may not waive objections to lack of subject-matter jurisdiction.  And this is not true only of litigants; federal courts, too, "have no warrant to expand Congress' jurisdictional grant 'by judicial

decree.'"  *Id.* at 696.

In short, practical, statutory, and constitutional considerations warrant vacatur of all Orders issued following the parties' settlement agreement and resulting dismissal.  That the practice of retaining jurisdiction for enforcement purposes might be common cannot, of course, inoculate that practice from scrutiny under fundamental legal principles.

**2. The Court Should Vacate Its November 21st Order Under Rule 60 Because It Resulted From "Mistake"; Because of Sandawana's Misrepresentations and Misconduct; and in the Interest of Justice**

Even if the Court finds that it possessed the requisite subject matter jurisdiction at all relevant times, it should nevertheless vacate its November 21, 2011 Order (and all portions of the November 14, 2011 Transcript supporting that Order) under various provisions of Federal Rule of Civil Procedure 60, for multiple reasons.

**a. The Court Should Vacate Its November 21st Summary Order Under Rule 60(a) Due to Legal and Factual "Mistake[s] Arising From Oversight" and under Rule 60(b)(1) Due to "Mistake"**

Federal Rule of Civil Procedure 60(a) authorizes a district court, "on a motion or on its own, with or without notice," to correct "a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record." Likewise, Rule 60(b)(1) authorizes a court to grant relief from a "final judgment, order, or proceeding" for, *inter alia*, "mistake."  The relevant "mistake" for purposes of Rules 60(a) and (b) may be an error by the district court.  *See Schildhaus v. Moe*, 335 F.2d 529, 531 (2d Cir. 1964) ("[T]here is indeed good sense in permitting the trial court to correct its own error and, if it refuses, in allowing a timely appeal from the refusal; no good purpose is served by requiring the parties to appeal to a higher court, often requiring

remand for further trial proceedings, when the trial court is equally able to correct its decision[.]")  As the Supreme Court has explained, Rule 60(a) reflects the "axiomatic" fact that "courts have the power **and the duty** to correct [orders] which have issued due to inadvertence or mistake."  *American Trucking Ass'ns, Inc. v. Frisco*, 358 U.S. 133, 145 (1958) (emphasis added).  Further, "Rule 60(b) is a remedial rule to be liberally construed."  *Dennis Michels Productions, Inc. v. Kaplan*, No. 89 Civ. 3726 (MBM), 1989 U.S. Dist. LEXIS 11631, at *5 (S.D.N.Y. Oct. 4, 1989).

With all due respect to the Court, the November 21st Order and the reasoning supporting it, as embodied in the transcript from the November 14th Proceeding, reflect several inadvertent legal and factual "mistakes" that justify vacatur of the Order.  Most significantly, the Court appears to have conflated the notion of a *commercial* use of a name with a *trademark* use of a name.  This distinction is relevant because the portion of the contract between the parties enumerating "assets" refers to *intellectual property* (including trademarks) specifically, and not to "commercial" uses or even "names."  In the somewhat analogous case of *J.A. Apparel Cop. v. Abboud*, 568 F.3d 390, 398 (2d Cir. 2009), the Second Circuit explained:

> [T]he fact that JA paid a large price for the Joseph Abboud brand (and existing licensing agreements) does not necessarily mean that JA purchased the right to prohibit Abboud from using his name to refer to himself in a non-trademark sense. ***There is no provision in the Sale Agreement conveying "all of Abboud's rights to use his name for commercial purposes,"*** JA Apparel, 591 F. Supp. 2d 306, 2008 WL 2329533, at *9, and the district court was not entitled to supply such a provision in the name of common sense, much less to call it "express[]."

(Emphasis added.)

As in *Abboud*, the operative language here does <u>not</u> prohibit all commercial uses

of the name "Henry Dunay," and the Court erred in ruling otherwise.

Apart from the Asset Purchase Agreement mentioned above, it is instructive to examine key language from the August 16, 2011 Consent Decree from which the November 21st Order derived. That Decree prohibits "using the Henry Dunay TRADEMARKS or any mark or design that incorporates and/is [*sic*] confusingly similar thereto, as a design, trade name, service mark, brand name, domain name, and/or designation of source or origin of any good or services relating to jewelry or the sale, licensing, manufacture, advertising, promotion, and/or distribution thereof." (Dkt. No. 19.) Under the plain language of this provision, for the use of the name "Henry Dunay" to fall within its scope, it must (a) incorporate **and** (b) be "confusingly similar to" "the Henry Dunay TRADEMARKS." In Sandawana's Complaint (Dkt. No. 1), it identified three purported "HENRY DUNAY Trademarks" (Compl. at. ¶ 15) – **none of which comprise the words "Henry Dunay" in plain text.** Each of Sandawana's purported "HENRY DUNAY Trademarks" consists of "WORDS, LETTERS, AND/OR NUMBERS **IN STYLIZED FORM**." (Emphasis added.) This is significant, because the U.S. Patent and Trademark Office routinely allows registrations in stylized form that it would refuse to register in a non-stylized form. *See*, *e.g.*, JEAN SHOP trademark registration, USPTO Reg. No. 2986633.

Further, the U.S. Patent and Trademark office recognized that the "DUNAY" registration – also in *stylized* text – was substantively different from a registration for HENRY DUNAY. In USPTO Office Action 207734-0050 (Colman Decl., Exh. C), issued in response to the application for the "DUNAY" mark, the Office **rejected** a "specimen"

showing the stylized "HENRY DUNAY" logo on a jewelry box.  The Trademark Examiner

explained: "The specimens are also unacceptable [as evidence of use in commerce]

because they do not match the drawing [of the plain-but-still-stylized "DUNAY" mark.]

The drawing displays the mark as DUNAY. However, this differs from the display of the

mark on the specimen, where it appears as HENRY DUNAY.  The applicant cannot

amend the drawing to conform to the display on the specimen because the character of

the mark would be materially altered. 37 C.F.R. § 2.72(a)[.]"

The language of the Mr. Dunay has at no point since the August 16, 2011 Order

"incorporated" any of the stylized "HENRY DUNAY Trademarks" into his websites,

online profiles, or anything else.  Dunay Decl. at ¶ 17.  To the extent the Court ruled

otherwise, it has committed a "mistake" or "oversight" warranting vacatur under Rule 60.

But even assuming *arguendo* the "HENRY DUNAY Trademarks" were

"incorporated" into any of Mr. Dunay's materials, the uses of Mr. Dunay's name at issue

here are not, as a matter of law, "trademark" uses for the purposes of the parties'

contracts (like, for example, a simple e-mail address or on a non-unique facebook

profile (as opposed a unique facebook "Page," which is unique and may be commercial

in nature.  Colman Decl. at ¶¶ 7-10.)  Again, under the plain language of the August

16th Order, Sandawana is not entitled to any relief in the absence of "likelihood of

confusion," let alone the extreme remedy the Court granted to the Plaintiff in its the

November 21st Order.

Respectfully, this counsel submits that the Court made the same reversible error

of law that the district court made in *Abboud*: in issuing its November 21st Order to

assign "all other internet accounts bearing [Henry Dunay's] name to Plaintiff," the Court erroneously "resolved [the operative question] without considering the proposed uses themselves," and gave "no indication of having considered such matters as the size, location, or context of the [designer's] name[.]"  *Abboud*, 568 F.3d at 402.

**<u>Facebook</u>**

While similar in nomenclature, facebook *profiles* are fundamentally different from facebook *pages*.  Facebook profiles (*see*, *e.g.*, Colman Decl. at ¶¶ 7-10) serve a primarily social function: to connect one with one's friends and acquaintances.  Notably, there is no limit to the number of facebook *profiles* that can be created for any given name, to the doubtless relief of the John Smiths of the world.  *Id.*  Facebook *pages*, by contrast, often serve commercial purposes, and do not have "friends," but rather a certain number of "Likes," or fans.  *Id.*  There can be only one facebook "page" under a certain name or phrase, *id.*, and **Mr. Dunay never created one.**  Dunay Decl. at ¶ 12.  Mr. Dunay did create a facebook *profile*, which had approximately 200 "friends," but over 90% of these individuals are, in fact, social acquaintances of Mr. Dunay and *not* customers or "fans."  Dunay Decl. at ¶ 11.  There are often *many* facebook profiles for individuals with the same name, which prevents similarly-named people from being blocked out of the social network.  Colman Decl. at ¶ 8.

Nevertheless, following the Court's issuance of its November 21st Order, Sandawana demanded access to Mr. Dunay's facebook *profile*, which he has never used for substantial commercial purposes.  Dunay Decl. at ¶ 10.  Indeed, the non-commercial nature of Mr. Dunay's facebook profile is underscored by the fact that it was

"Private," such that most of the information it contained about him was not visible to the general public.  *Id.*  If one were to give Sandawana the benefit of the doubt, one might imagine that Sandawana wants access to Dunay's profile because it assumes that his "facebook friends" are primarily customers.  But that is not the case.  Dunay Decl. at ¶ 11 ("I used facebook to stay in touch with [friends and acquaintances.]  I do not consider this group of people to be a 'client list,' or anything else of the sort.")  If Sandawana wished to create its own *profile* OR *page* for "Henry Dunay," it could do so <u>today</u> (though Defendant would dispute the legality of that action.

But even giving Sandawana this benefit of the doubt at to its motives or misunderstandings, the threatening manner in which its representative demanded access to Defendant's facebook profile – going so far as to tell a 76-year-old in poor health problems that he would be "put in jail" if he did not let a Sandawana employee *into his apartment* to log in to his facebook profile, Dunay Decl. at ¶ 25 – is inexcusable, warranting vacatur of the November 21st Order on its own (as further explained below.)

### <u>Twitter</u>

Nor is a Twitter account, by itself, inherently likely to confuse as to source, even when it is an exact duplicate of a registered mark.  Yet the Court lumped it in with all other "Internet accounts," apparently without having inquired into how this platform worked or how Mr. Dunay had used his account.  *See generally* Colman Decl., Exh. B.  Thus, leaving aside for the moment the fact that Mr. Dunay has *cancelled* his Twitter account, it is informative to examine his actual "tweets," many of which ***are dedicated primarily to <u>dispelling</u> potential consumer confusion, rather than encouraging it***.

*See*, *e.g.*:

- 12: HENRY DUNAY: I'm Giving 'CERTIFICATES OF AUTHENTICITY' For Every Piece of Jewelry That 'I' 'Made' Under Dunay Logo ***Since I Don't Own That Company*** 2127689700 6:00 PM Nov 17th, 2010

· 14: HENRY DUNAY: Info ABOUT ME & WHERE YOU CAN FIND MY LATEST COLLECTIONS: [http://]henrydunay.net ONLY Under My New Company H.D.D. Inc. With LOGO 1:27 PM Nov 10th, 2010

· 17: HENRY DUNAY: I'm Back to Design & Make JEWELRY, as I've Been Making For The Past 50 Years! ONLY with MY NEW LOGO: 'HD' ***Under My New Company HDD Inc.*** 2:46 Oct 14th, 2010

Colman Decl., Exh. A at 54-56 (capitalization original; spacing modified). Indeed, rather than attempting to confuse the public, Mr. Dunay has sought to *inform* the public that he not associated with a company that is selling designs he was not involved in creating or approving. Dunay Decl. at ¶ 20. One can only gather from Sandawana's efforts to poach Mr. Dunay's entire online identity that it does not share the same concern about consumer confusion.

### E-mail Account(s)

As discussed above, the Court appears to have erroneously conflated the very different creatures of domain names, which serve as addresses for websites visible to the public and can thus serve a passive marketing function, with e-mail addresses, which can serve only active communicative functions and are ill-suited to marketing. *See* Colman Decl., Exh. B at Transcript Page 9.

### "All Other Internet Accounts Bearing [Mr. Dunay's] Name"

The overly broad language of the Court's November 21st Order, requiring that he "assign[] the henrydunay.net domain name ***and all other internet accounts bearing***

***his name to Plaintiff***," if allowed to stand, would effectively prevent Mr. Dunay not only

from engaging in any commerce on the Internet, but *from using the Internet at all*.

Further, the bolded portion of the Order is entirely untethered from the strictly limited

language of the parties' settlement agreement, as embodied in the Court's August 16th

Order.  As such, the November 21st Order should be vacated on the ground of

"mistake" under Rules 60(a) and (b).

> **b.   The Court Should Vacate Its November 21st Order Under Rule 60(b)(3) Due to Plaintiff's Misrepresentations and Misconduct, and/or under Rule 60(b)(6) for "Any Other Reason That Justifies Relief," Including Sandawana's Demonstrated Intention to Abuse the Order If the Court Allows It to Stand**

Federal Rule of Civil Procedure 60(b)(3) provides that a court may "on motion

and just terms, [a] court may relieve a party . . . from a final judgment, order, or

proceeding for . . . fraud (whether previously called intrinsic or extrinsic),

misrepresentation, or misconduct by an opposing party."  Misrepresentations or

misconduct warranting relief need not be intentional in nature.  *See Catskill Dev., L.L.C.*

*v. Park Place Entm't Corp.*, 286 F. Supp. 2d 309, 315 (S.D.N.Y. 2003).

The manner in which Sandawana and its representatives have conducted

themselves, abusing the Court's November 21st Order through misrepresentations to

and deliberate intimidation of an older *pro se* litigant, justifies vacatur of the November

21st Order under Fed. R. Civ. P. 60(b)(3) or 60(b)(6).  Mr. Dunay's Declaration speaks

for itself.  *See*, *e.g.*, Dunay Decl. at ¶ 21 ("I believe Sandawana's conduct (primarily

through its attorneys) has been reprehensible at many points during this litigation."); ¶

22 ("In part for this reason, this litigation has taken a great emotional toll on me, which

may well have adversely impacted my health."); ¶ 23 ("After my previous counsel

withdrew from this case, Sandawana's conduct became much more aggressive.  It

seemed that they are trying to intimidate me, perhaps because I was not represented for

a time, or perhaps because of my age."); ¶ 24 ("In one especially traumatic episode,

Sandawana's lawyer, Peter Berger, called me on November 24, 2011, at around 12:10

P.M., in which he demanded that I transfer my private, personal facebook account, my

Twitter account, and the henrydunay.net domain name (the last of which has since been

transferred.); ¶ 25 ("Berger stated that I had better transfer all of these to Sandawana

soon, as he "did not want to have to put me in jail for contempt."); ¶ 26 ("As long as

Sandawana continues its threats, I will continue to suffer emotionally and am afraid to

maintain any identifiable presence on the Internet.")  Sandawana should not be

rewarded for its behavior; instead, the November 21st Order should be vacated.

3. **If the Court Finds that It Possessed the Requisite Jurisdiction at All Times and Declines to Vacate Its Orders in this Action, It Should Nevertheless Stay the Effect of Those Orders Pending Appeal**

If the Court declines to vacate its November 21st Order under any of the

foregoing bases, it should nevertheless stay the effect of that Order pending appeal,

particularly in light of Plaintiffs' demonstrated intention to abuse it.  To the extent any

relevant Orders are interlocutory in nature, an immediate appeal may be taken from

them under 28 U.S.C. § 1292(a)(1) because the Orders are "'directed to a party,

enforceable by contempt, and designed to accord or protect some or all of the

substantive relief sought by a complaint.'"  *HBE Leasing Corp. v. Frank*, 48 F.3d 623,

633-34 (2d Cir. 1995) (internal citations omitted).  Of course, to the extent these Orders

are "final," they are immediately appealable.

## IV. CONCLUSION

If Sandawana is to have its way, Henry will be effectively banished from using his name on the Internet.  This would not only be inequitable and very likely unconstitutional, it is a result at odds with the parties' Asset Purchase Agreement, the August 2011 settlement (which contains an exception for "descriptive uses"), and the fundamental purpose of trademark law – to prevent *confusion* – which has received only perfunctory lip service by Sandawana.  In the interest of justice, factual and legal mistakes made, Plaintiff's misrepresentations and misconduct, and, most importantly, the Court's lack of jurisdiction to issue the Order(s) in question or even hear this case, the August 16, 2011 and November 21, 2011 Orders should be vacated and the case dismissed with prejudice.  Defendant would greatly appreciate a ruling from the Court on all issues briefed in this Memorandum of Law as soon as practicable, as Mr. Dunay's filing of a Notice of Appeal will divest the Court of jurisdiction for the time being.

Dated:      New York, New York
              December 5, 2011


By:      /s/ Charles E. Colman
**Charles E. Colman, Esq.**
**Charles Colman Law, PLLC**
**1776 Broadway, 21st Floor**
**New York, NY 10019-0064**
**Telephone: (917) 515-5875**
**Fax: (917) 534-6294**
**cc@charlescolmanlaw.com**

*Attorney for Defendant Henry Dunay*